BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
BLAIR A. NICHOLAS   (Bar No. 178428)
BENJAMIN GALDSTON   (Bar No. 211114)
DAVID R. KAPLAN   (Bar No. 230144)
LUCAS E. GILMORE   (Bar No. 250893)
RACHEL FELONG   (Bar No. 279942)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRIS STRICKLIN, DALER RAKHMET-ZADE, LORI GOTTLIEB, AMY COCK, SARAH GREENWALD, and MICHELLE MANNING, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., VOLKSWAGEN OF AMERICA, INC., and VOLKSWAGEN AG,<br><br>                    Defendants. | Case No. 2:15-cv-7431<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

Page

I.     NATURE AND SUMMARY OF THE ACTION ..................................1

II.    JURISDICTION AND VENUE..............................................................3

III.   PARTIES ................................................................................................4

       A.   Plaintiffs ......................................................................................4

       B.   Defendants ...................................................................................6

IV.    VOLKSWAGEN'S VIOLATIONS OF FEDERAL AND
       STATE EMISSIONS STANDARDS......................................................7

       A.   Company Background...................................................................7

       B.   The Emissions Of Volkswagen Vehicles Are Strictly
            Regulated Under U.S. Federal And State Laws............................8

       C.   Volkswagen's Marketing Of Its "CleanDiesel" Vehicles...................11

       D.   Volkswagen Charged A Premium For Its "CleanDiesel"
            Vehicles .....................................................................................16

       E.   Volkswagen's Express Warranties..............................................18

       F.   Volkswagen Failed To Meet Applicable Emissions
            Standards And Employed A "Defeat Device" To Evade
            The Standards .............................................................................19

            1.   The International Council For Clean
                 Transportation/West Virginia University Study.......................19

            2.   The EPA And CARB Investigations And
                 Volkswagen's Private Admission..............................................21

            3.   The EPA And CARB Announce A Notice Of
                 Violation And In-Use Compliance Letter.................................22

            4.   Volkswagen Admits To Using Defeat Devices To
                 Cheat On Emissions Tests And Announces That It
                 Would Suspend Sales Of CleanDiesel Vehicles.......................25

V.     TOLLING OF THE STATUTE OF LIMITATIONS ..............................26

VI.    CLASS ALLEGATIONS .......................................................................27

VII.   CLAIMS FOR RELIEF..........................................................................30

COUNT I  VIOLATIONS OF THE MAGNUSON-MOSS
       WARRANTY ACT, 15 U.S.C. § 2301, *et seq.*
       (On Behalf Of The Nationwide Class) .......................................................30

COUNT II  BREACH OF CONTRACT
 (On Behalf Of The Nationwide Class) ..........................................32

COUNT III  FRAUDULENT CONCEALMENT AND
 FRAUDULENT MISREPRESENTATION
 (On Behalf Of The Nationwide Class) ..........................................33

COUNT IV  UNJUST ENRICHMENT
 (On Behalf Of The Nationwide Class) ..........................................34

COUNT V  VIOLATIONS OF STATE CONSUMER PROTECTION
 AND UNFAIR COMPETITION STATUTES
 (On Behalf Of The Nationwide Class) ..........................................35

COUNT VI  VIOLATION OF SONG-BEVERLY CONSUMER
 WARRANTY ACT, CAL. CIV. CODE §§ 1791.1 & 1792
 (On Behalf Of The California Class)..............................................37

COUNT VII  BREACH OF IMPLIED WARRANTY OF
 MERCHANTABILITY, CAL. COM. CODE § 2314
 (On Behalf Of The California Class)..............................................39

COUNT VIII  BREACH OF CONTRACT
 (On Behalf Of The California Class)..............................................40

COUNT IX  VIOLATIONS OF CALIFORNIA UNFAIR
 COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200,
 *et seq*. (On Behalf Of The California Class) ................................41

COUNT X  VIOLATIONS OF CALIFORNIA CONSUMERS
 LEGAL REMEDIES ACT, CAL. CIV. CODE § 1750, *et seq*.
 (On Behalf Of The California Class)..............................................43

COUNT XI  VIOLATIONS OF CALIFORNIA FALSE
 ADVERTISING LAW, CAL. BUS. & PROF. CODE § 17500,
 *et seq*. (On Behalf Of The California Class) ................................45

COUNT XII  FRAUDULENT CONCEALMENT
 (On Behalf Of The California Class)..............................................47

VIII. PRAYER FOR RELIEF ......................................................50

IX. JURY TRIAL DEMAND ......................................................52

## I.   NATURE AND SUMMARY OF THE ACTION

1.     This is a nationwide class action brought on behalf of hundreds of thousands of consumers who purchased or leased "clean diesel" automobiles manufactured and sold by Volkswagen between 2009 and 2015.[1]  For more than six years, Volkswagen touted the "extreme efficiency" and "ultra-low-sulfur" technology of its automobiles equipped with 2.0L, four-cylinder "clean diesel" engines that purportedly met the federal Environmental Protection Agency ("EPA") and even more rigorous California Air Resources Board ("CARB") emission standards while delivering superior performance and fuel efficiency.

2.     Volkswagen aggressively marketed these vehicles as having the "*world's cleanest diesel engines*" that comply with the "*most demanding emissions laws*."  In widely distributed sales brochures, Volkswagen boasted that its "*[c]lean diesel vehicles meet the strictest EPA standards*" while "*reduc[ing] sooty emissions by up to 90%*," providing consumers "*a fuel-efficient and eco-conscious vehicle*."

3.     In response to these and similar claims, sales of Volkswagen's "CleanDiesel" automobiles soared, reviving interest in an alternative fuel that had all but disappeared by 2004 due to increasingly strict environmental regulations and consumer distaste.  Volkswagen rapidly generated a dedicated following of younger eco-enthusiasts, claiming "This ain't your daddy's diesel" – meaning diesel engines were no longer noisy, smelly, poor-performing polluters but could provide performance and fuel



---

[1] Defendants in this action are Volkswagen Group of American, Inc., Volkswagen of America, Inc., and Volkswagen Aktiengesellschaft (d/b/a Volkswagen Group and/or Volkswagen AG (collectively, "Defendants," "Volkswagen," or the "Company").

efficiency that was comparable – if not superior – to conventional gasoline engines, all in an eco-friendly package.

4.     These qualities, however, came at a significant premium.   For a "CleanDiesel" vehicle, Volkswagen charged consumers between ***$1,000 to $7,000 or more*** over the comparably-equipped gasoline version of the same model. Nevertheless, in its most recently reported sales for August 2015, nearly one-quarter of all Volkswagens sold were equipped with diesel engines.

5.     By mid-2014, consumer groups and regulators began questioning Volkswagen's supposedly revolutionary technology. Yet, for over a year, Volkswagen denied cheating on emissions tests.

6.     On September 18, 2015, the EPA issued a bombshell Notice of Violation regarding Volkswagen's use of a "defeat device" to cheat on emissions tests. The EPA's Notice of Violation detailed the EPA's determination that Volkswagen "***manufactured and installed defeat devices***" in model year 2009 through 2015 passenger vehicles with 2.0L diesel engines.  The "defeat device" – secret, sophisticated software – automatically detected when the vehicles were undergoing emissions testing and engaged the vehicles' full emissions controls in order to meet regulatory standards.  However, at all other times, the defeat device disabled the emissions controls, causing Volkswagen "CleanDiesel" cars to emit ***as much as 40 times*** the EPA allowable emission of nitrogen oxides ("NOx").  As Cynthia Giles, Assistant Administrator for the Office of Enforcement and Compliance Assurance at the EPA, stated: ***"Using a defeat device in cars to evade clean air standards is illegal and a threat to public health.  The EPA ordered Volkswagen to immediately recall all affected vehicles."***

7.     Two days later, Volkswagen and its Chief Executive Officer, Martin Winterkorn, issued a stunning public apology admitting to years of deceptive practices and purposely manipulating emissions tests for approximately 500,000 vehicles sold in the United States, stating Volkswagen was "***deeply sorry that we***

*have broken the trust of our customers and the public*." The Company also ordered its U.S. dealers to halt sales of all diesel automobiles.

8.      Most recently, on the day of the filing of this Complaint, Volkswagen admitted that the problem was global and impacted *11 million vehicles worldwide*. Regulators in the U.S. and abroad have called for probes of Volkswagen's deliberate cheating on emissions standards. As Senator Bill Nelson, a leading member of the Senate Commerce, Science and Transportation Committee stated in calling for an investigation of Volkswagen by the Federal Trade Commission, "*I am outraged that VW would cheat its customers by deceiving them into buying a car that wasn't what was advertised*."

9.      Plaintiffs and other members of the prospective classes have suffered significant harm as a result of Volkswagen's illegal practices. For example, in addition to the hefty premiums charged by Volkswagen for vehicles equipped with its 2.0L "Clean Diesel" engine, 75,000 Volkswagen cars sold in California - *nearly 15% of the affected vehicles* – are effectively worthless. Under California law, these cars cannot be registered, driven or resold until certification with California emissions standards can be established. Moreover, although Volkswagen has been ordered by the EPA to recall approximately 500,000 affected vehicles to comply with EPA emissions requirements, Volkswagen will not be able to make the affected vehicles comply with emissions standards without substantially degrading vehicle performance, including horsepower and fuel efficiency.

10.     Plaintiffs now bring this suit on behalf of themselves and proposed nationwide and California classes to obtain damages (both actual and punitive), restitution, and to enjoin Volkswagen from continuing to deceive consumers.

## II.     JURISDICTION AND VENUE

11.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Classes are citizens of states different from Defendants' home state or country, there are more than 100

Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs either reside in Los Angeles County or submit to the Court's jurisdiction.  This Court has personal jurisdiction over Defendants because they have conducted and continue to conduct substantial business in the District, and because they have committed acts and omissions complained of herein in the District, including the marketing and leasing of clean diesel vehicles to certain of the Plaintiffs in the District.

13.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events of omissions giving rise to the claims occurred and/or emanated from this District (including the marketing, advertisement, sale, and leasing of affected vehicles), and Volkswagen has caused harm to Class members residing in this district.

## III.   PARTIES

### A.   Plaintiffs

14.     Plaintiff Iris Stricklin is a resident and citizen of California.  In 2013, she purchased a 2010 model year Volkswagen Jetta TDI from a Volkswagen dealership located in Murrieta, California.

15.     Plaintiff Daler Rakhmet-Zade is a resident and citizen of California.  In 2014, he leased a 2014 model year Volkswagen Jetta TDI from a Volkswagen dealership located in Hawthorne, California.

16.     Plaintiff Lori Gottlieb is a resident and citizen of California.   In September 2014, she purchased a 2014 model year Volkswagen Jetta TDI from a Volkswagen dealership located in Los Angeles, California.

17.     Plaintiff Amy Cock is a resident and citizen of Oregon.  In June 2011, she purchased a 2011 model year Volkswagen Jetta TDI from a Volkswagen dealership located in Salem, Oregon.

18.     Plaintiff Sarah Greenwald is a resident and citizen of New York.  In October 2013, she purchased a 2014 model year Volkswagen Jetta SportWagen TDI from a Volkswagen dealership located in Greenwich, Connecticut.

19.     Plaintiff Michelle Manning is a resident and citizen of Rhode Island.  In 2011, she purchased a 2010 model year Volkswagen Jetta TDI from a Volkswagen dealership located in Wakefield, Rhode Island.

20.     Each of the Plaintiffs purchased or leased a car powered by a 2.0L "TDI" turbocharged diesel engine with a defect and in a transaction where Volkswagen did not disclose materials facts related to the vehicle's emission of pollutants far in excess of allowed levels.  As a result, each Plaintiff did not receive the benefit of their bargain and/or overpaid for their vehicles, made lease payments that were too high, and/or sold their vehicles at a loss when the public gained partial awareness of the defect.

21.     More specifically, at the time each of the Plaintiffs purchased their vehicles, the vehicles were equipped with a defeat device installed by Volkswagen that permitted the vehicles to pass applicable federal and state emissions tests and obtain unwarranted emissions certifications, including from the EPA.  The device controlled emissions from the vehicles during emissions tests, but at all other times the vehicles were in operation they emitted pollutants that significantly exceeded the allowed level of pollutants (including NOx), by up to forty times.

22.     Plaintiffs purchased their vehicles, in whole or in part, due to the CleanDiesel engine system advertised and marketed by Volkswagen as both fuel efficient and environmentally friendly.  However, none of the advertisements and marketing materials provided to Plaintiffs, nor representations received by Plaintiffs from Volkswagen or its agents, dealers, or other representatives, made any mention or disclosure related to the defeat device that Volkswagen secretly installed on these vehicles. If Volkswagen had disclosed that its class of CleanDiesel vehicles actually emitted up to 40 times (or more) the allowable levels of NOx pollutants, Plaintiffs

would not have purchased their vehicles.   Plaintiffs have suffered ascertainable losses as a result of Volkswagen's omissions and/or misrepresentations associated with the CleanDiesel engine system, including but not limited to, out-of-pocket loss and future attempted repairs, future additional fuel costs, and diminished value of their vehicles.

### B.   **Defendants**

23.   Defendant Volkswagen Group of America, Inc. ("Volkswagen") is a corporation doing business in all 50 states (including the District of Columbia) and is organized under the laws of the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia.

24.   Defendant Volkswagen of America, Inc., is a corporation incorporated in the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia.   Based on information and belief, it is an operating unit of Volkswagen Group of America, Inc.

25.   Defendant Volkswagen Aktiengesellschaft, doing business as Volkswagen Group and/or Volkswagen AG ("VW AG"), is a corporation organized and existing under the laws of Germany, with its principal place of business located in Wolfsburg, Germany. VW AG is the parent corporation of Volkswagen Group of America, Inc.

26.   At all times relevant to this action, Volkswagen manufactured, distributed, sold, leased, and warranted the Affected Vehicles (defined below) throughout the United States under the Volkswagen and Audi brand names. Volkswagen and/or its agents designed, manufactured, and installed the CleanDiesel engine systems in the Affected Vehicles, which included the defeat device. Volkswagen also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

## IV. VOLKSWAGEN'S VIOLATIONS OF FEDERAL AND STATE EMISSIONS STANDARDS

### A. Company Background

27.     Volkswagen is a German automotive company that manufactures and sells vehicles under the Volkswagen, Audi, Porsche and other brand names with operations in approximately 150 countries, including the United States.  In the first half of 2015, Volkswagen surpassed Toyota as the world's largest automaker by sales, selling 5.04 million vehicles in the first six months of the year.  By July 2015, Volkswagen ranked eighth on the Fortune Global 500 list of the world's largest companies.

28.     Despite Volkswagen's ascension to become the world's biggest automaker, a position the Company had long coveted, Volkswagen has struggled in the United States.  According to a July 28, 2015 article in *USA Today* titled "VW surpasses Toyota as world's largest automaker in first half of 2015," industry experts attribute Volkswagen's comparatively lower sales in the lucrative U.S. market to the brand's lack of "selection" and "lag[] on quality."  In the 2015 J.D. Power and Associates Initial Quality Study, which examines new vehicles, Volkswagen's namesake brand ranked 24th out of thirty-three brands sold in the U.S.  Accordingly, Volkswagen has focused on making its brand a stronger player in the United States by touting the performance and reliability of its vehicles and the Company's environmental leadership, while reining in costs and increasing profitability.  For example, the Company's 2013 Annual Report emphasizes at the very beginning of its "Goals and Strategies" section that "Volkswagen intends to become the global economic and environmental leader among automobile manufactures by 2018" and that "[w]e are focusing in particular on the environmentally friendly orientation and profitability of our vehicle projects."

### B. The Emissions Of Volkswagen Vehicles Are Strictly Regulated Under U.S. Federal And State Laws

29.     The Clean Air Act ("CAA"), enacted in 1970, is a comprehensive federal law that regulates air emissions from stationary and mobile sources. 42 U.S.C. § 7401, *et seq.* (1970). In creating the CAA, Congress determined that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare." CAA § 101(a)(2), 42 U.S.C. § 7401(a)(2). The CAA and the regulations promulgated thereunder are designed to reduce the emission of NOx and other pollutants, thereby protecting human health and the environment.

30.     Under the CAA, light-duty vehicles must satisfy emission standards for certain air pollutants, including NOx. NOx pollution can result in a variety of harmful effects on human health and the environment. NOx contributes to nitrogen dioxide, ground-level ozone, and fine particulate matter. When humans are exposed to nitrogen dioxide, they may be at a greater risk for serious health dangers, including asthma attacks and other respiratory illness requiring hospitalization. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory illness are at an elevated risk for suffering adverse health consequences associated with these pollutants.

31.     Under the CAA, vehicle manufacturers are required to certify to the EPA that vehicles sold in the United States meet the applicable federal emissions standards. Through this program, the EPA issues certificates of conformity ("COC") to vehicles that are deemed to satisfy applicable emission standards. These emissions standards are designed to control air pollution. In order to be sold in the United States, a vehicle must be issued a COC by the EPA.

32.     To obtain a COC, the manufacturer of a light-duty vehicle must submit a COC application to the EPA for each test group of vehicles that it intends to place

into the stream of commerce in the United States. This application must disclose a list of all auxiliary emission control devices ("AECD") installed on the vehicles.

33.  The CAA makes it a violation for "any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."

34.  An AECD is defined as "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system."  40 C.F.R. § 86.1803-01.  The COC application must include "a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and [a] rationale for why it is not a defeat device."  40 C.F.R. § 86.1844-01(d)(11).

35.  In particular, the CAA defines a "defeat device" as an AECD "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation use."  When a defeat device is in place, it can bypass, defeat, or render inoperative elements of the vehicle's emission control system that are put in place to ensure compliance with the CAA.  Motor vehicles that are equipped with defeat devices cannot be certified by the EPA.[2]

---

[2] EPA, *Advisory Circular Number 24: Prohibition on use of Emission Control Defeat Device* (Dec. 11, 1972).

36.     California has emission standards that are similar in structure to the EPA requirements, but are more stringent.  The development of California emission standards has included Tier 1/Low Emission Vehicles ("LEV") standards extended through 2003, LEV II regulations phased-in through model years 2004-2010, and LEV III regulations, which were phased-in through model years 2015-2025.  The LEV standards applicable in California include the following classes of vehicles: Tier 1; Transitional Low Emission Vehicles (TLEV); LEV; Ultra Low Emission Vehicles (ULEV); and Zero Emission Vehicles (ZEV).  Under these standards, car manufacturers are required to produce a certain percentage of vehicles pursuant to increasingly more stringent emission categories.

37.     In California, these same stringent standards for the emission of gaseous pollutants applies to diesel-powered vehicles.

38.     In November 1998, the CARB adopted LEV II emission standards which were phased-in between 2004 and 2010.  These standards set forth three even more stringent classes: LEV, ULEV, and Super Ultra Low Emission Vehicles ("SULEV").  The LEV II emission standards allowed for significantly less emissions of NOx and particulate matter than was allowable under Tier 1/LEV.  These stricter standards apply equally to vehicles powered by gasoline and diesel.  As a result of these standards, diesel-powered vehicles could only pass in the presence of particulate filters and NOx reduction catalysts.

39.     In January 2012, the LEV III emission standards were adopted.  These standards will be phased-in over the 2015-2025 model years, but manufacturers may certify vehicles to the higher standards prior to model year 2015.  The new standards have tightened particulate matter standards; the stringent standards were enacted in part to ensure that particulate filters be used on all diesel engines.

40.     Through its LEV program, California has adopted emissions standards even stricter than the EPA.  Similar to the EPA, the CARB implements California's

vehicle regulations through a certification process, in-use compliance, and enforcement actions.

41.     As part of the certification process, CARB tests vehicles to ensure that their emissions performance is as expected throughout the useful life of the vehicle. A number of states have adopted California's strict emissions standards, including Oregon, New York, Rhode Island, Washington, New Jersey, Massachusetts, Maine, Connecticut, Pennsylvania, Vermont, New Mexico, Maryland, and Florida.

### C.    <u>Volkswagen's Marketing Of Its "CleanDiesel" Vehicles</u>

42.     Since 2008, Volkswagen has manufactured and sold a line of diesel-fuel vehicles known as "CleanDiesel." Vehicles marketed as "CleanDiesel" are powered by the Company's 2.0L turbo diesel four-cylinder engines.   Volkswagen's advertisements assured customers that its vehicles were the cleanest diesel engines and the most environmentally friendly.

43.     Since introducing its 2.0L TDI CleanDiesel engine in 2008, Volkswagen has touted it as a "fantastic power train" that "gives very good fuel economy" and "is also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would . . . cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95% . . . [and is] clean enough to be certified in all 50 states."[3]

44.     "TDI" stands for "Turbocharged Direct Injection."  The TDI engines are turbocharged and directly inject fuel into each cylinder via fuel injectors.  With respect to its TDI engines, Volkswagen has stated, "[t]he superior qualities of the 2.0 Liter TDI engine with common rail injection systems are oriented towards future challenges in acoustics, comfort, and exhaust gas after-treatment . . . confirming Volkswagen's role as a pioneer in diesel technology."

---

[3] Statement of Volkswagen Group of America, Inc.'s Chief Operating Officer Mark Barnes, to The Business Insider, October 9, 2009.

45.     At all relevant times herein, Volkswagen represented that the TDI engine satisfies current emissions standards due to its unique after-treatment system, which features a diesel particulate filter, upstream oxidation catalyst, and low and high pressure Exhaust Gas Recirculation ("EGR").  According to Volkswagen, "[t]he most effective measure to reduce nitrous oxides (NOx) with an internal combustion engine is by introducing very high exhaust gas recirculation rates into the combustion chamber."

46.     The exhaust chamber of the TDI engine contains four components, each serving a different purpose: 1) oxidation catalytic converter; 2) particulate filter; 3) NOx filter; and 4) H2S catalytic converter.

47.     In order to comply with strict emissions regulations enacted in 2008, many manufacturers of diesel cars began outfitting their vehicles with tanks of a urea-based solution known as "AdBlue".  This solution is thought to reduce emissions of NOx.  According to Volkswagen, however, its small vehicles powered by the 2.0L TDI engine did not require AdBlue in order to reduce NOx emissions.

48.     Volkswagen began aggressively marketing its CleanDiesel vehicles beginning no later than the 2009 model year.  This marketing strategy was intended to solidify Volkswagen's market power for diesel powered vehicles in the United States.

49.     In fact, in marketing its CleanDiesel vehicles, Volkswagen has relied heavily on its purported compliance with emissions regulations.   In 2008, Volkswagen marketed the CleanDiesel vehicles as having the "world's cleanest diesel engines" that comply with the world's "most demanding emissions laws." Volkswagen brochures distributed to customers and members of the Class touted that its "Clean diesel vehicles meet the strictest EPA standards in the U.S.  Plus, TDI technology helps reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle."   As discussed below, the vehicles listed in these brochures – the Volkswagen Jetta TDI, the Volkswagen Jetta SportWagen TDI, the

Volkswagen Golf TDI, the Volkswagen Passat TDI, and the Volkswagen Beetle TDI – have all since been found to be grossly noncompliant with EPA standards.

50.     In an October 2009 interview with Business Insider, when asked "[w]hat is the advantage of a diesel over a hybrid," VW of America's Chief Operating officer, Mark Barnes, stated: "It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%.  So, a very very clean running engine. Clean enough to be certified in all 50 states."[4]

51.     Volkswagen Group's Jetta and Audi A3 diesels won the 2009 and 2010 Green Car of the Year awards given by auto trade publication Green Car Journal.

52.     Throughout the relevant period, Volkswagen repeatedly touted the reduced emissions of its 2.0L TDI clean diesel engines to U.S. consumers. For example, Volkswagen claimed that the system runs on ultra-low-sulfur diesel, *helping reduce sooty emissions by up to 90% compared to previous diesel engines*.

---

[4] Gayathri Vaidyanathan, *Volkswagen Preps for a Diesel Revolution,* The Business Insider, Oct. 9, 2009, http://www.businessinsider.com/volkswagen-preps-for-a-diesel-revolution-2009-10.



53.    Volkswagen also emphasized the fuel efficiency of the TDI Clean Diesel along with its cleanliness.  For example, in a marketing brochure for the 2014 VW Jetta TDI Clean Diesel, Volkswagen not only claimed that the car had a greater range on a single tank of gas than did the Honda Civic Hybrid, Mazda 3, Toyota Prius and Ford Focus SFE, but also claimed that "***The Jetta TDI has lower CO2 emissions compared to 90% of other vehicles engines***.  ***So every getaway you make will be a cleaner one***."

54.    Volkswagen also touted the performance characteristics of the TDI Clean Diesel, claiming that clean emission technology did not sacrifice its ***236 lbs/ft of torque and turbocharged clean diesel engine***.  In a recent 2015 Volkswagen Golf

sales brochure, Volkswagen stated "With the 2.0L TDI engine, you'll appreciate every fuel-efficient mile with the EPA-estimated 45 hwy mpg. ***But that's only half the story. Step on the pedal and feel the 236 lb-ft of torque and let the performance tell the other half***."



 

55. Volkswagen also claimed that TDI Clean Diesel models "typically have a higher resale value versus comparable gasoline vehicles":



56.    Volkswagen touted its CleanDiesel vehicles as a fun-to-drive alternative to other fuel-efficient and environmentally friendly cars, claiming that the diesel cars can achieve hybrid-like fuel mileage, but greater torque and horsepower than hybrid vehicles.  Marketing efforts by Volkswagen emphasized the benefits to a consumer of choosing a diesel vehicle over a hybrid.

57.    Volkswagen attempted to boost sales of these TDI vehicles through mass-advertisements aimed at the average consumer, by raising awareness of what it called its "TDI Clean Diesel Technology."  Advertisements also praised the fuel efficiency of TDI CleanDiesel engines, along with the higher resale values enjoyed by those models.

58.    Sales of Volkswagen TDI CleanDiesel vehicles rose steadily.  In 2008, Volkswagen sold 12,000 units of these vehicles in North America.   In 2013, Volkswagen sold 100,000 units of these vehicles in North America, a nearly tenfold increase.  With a 78% share of the North American diesel automobile market, Volkswagen sold more diesel cars in the United States than every other brand combined.

**D.    Volkswagen Charged A Premium For Its "CleanDiesel" Vehicles**

59.    As reflected by the tables below, Volkswagen charged consumers a substantial premium for its supposedly environmentally-friendly CleanDiesel models.

## VW Passat: 2012-2015 Model Years

| Standard Model | Standard Model MSRP | TDI Model | TDI Model MSRP | MSRP Premium |
|---|---|---|---|---|
| 2012 4dr Sdn 2.5L Manual S | $20,590 | 2012 4dr Sdn 2.0L Manual TDI SE | $25,995 | $5,405 |
| 2013 4dr Sdn 2.5L Manual S | $20,845 | 2013 4dr Sdn 2.0L Manual TDI SE | $26,225 | $5,380 |
| 2014 4dr Sdn 1.8T Manual S | $20,995 | 2014 4dr Sdn 2.0L Manual TDI SE | $26,675 | $5,680 |
| 2015 4dr Sdn 1.8T Manual S | $21,340 | 2015 4dr Sdn 2.0L Manual TDI SE | $27,095 | $5,755 |

## VW Jetta SportWagen: 2009-2015 Model Years



| Standard Model | Standard Model MSRP | TDI Model | TDI Model MSRP | MSRP Premium |
|---|---|---|---|---|
| 2009 4dr 2.5L Manual SportWagen | $19,075 | 2009 4dr Manual TDI SportWagen | $23,870 | $4,795 |
| 2010 4dr Manual S SportWagen | $19,510 | 2010 4dr Manual TDI SportWagen | $24,615 | $5,105 |
| 2011 4dr Manual S SportWagen | $19,995 | 2011 4dr Manual TDI SportWagen | $24,995 | $5,000 |
| 2012 4dr Manual S SportWagen | $20,195 | 2012 4dr Manual TDI SportWagen | $25,540 | $5,345 |
| 2013 4dr Manual S SportWagen | $20,595 | 2013 4dr Manual TDI SportWagen | $25,795 | $5,200 |
| 2014 4dr Manual S SportWagen | $20,995 | 2014 4dr Manual TDI SportWagen | $26,565 | $5,570 |

## VW Beetle: 2009-2015 Model Years



| Standard Model | Standard Model MSRP | TDI Model | TDI Model MSRP | MSRP Premium |
|---|---|---|---|---|
| 2012 2dr Cpe Manual | $18,995 | 2012 2dr Cpe Manual 2.0T Turbo | $23,295 | $4,300 |
| 2013 2dr Manual 2.5L | $19,995 | 2013 2dr Manual 2.0L TDI | $23,495 | $3,500 |
| 2014 2dr Manual 1.8T | $20,295 | 2014 2dr Manual 2.0L TDI | $24,595 | $4,300 |
| 2015 2dr Auto 1.8T Classic *Ltd Avail* | $20,195 | 2015 2dr 2.0L TDI *Ltd Avail* | $24,795 | $4,600 |

## VW Golf: 2014-2015 Model Years

| Standard Model | Standard Model MSRP | TDI Model | TDI Model MSRP | MSRP Premium |
|---|---|---|---|---|
| 2015 4dr Manual TSI S w/sunroof | $21,295 | 2015 4dr HB Manual TDI S | $22,345 | $1,050 |

## VW Jetta: 2009-2015 Model Years



| Standard Model | Standard Model MSRP | TDI Model | TDI Model MSRP | MSRP Premium |
|---|---|---|---|---|
| 2009 4dr Manual S Sedan | $17,515 | 2009 4dr Manual TDI Sedan | $22,270 | $4,755 |
| 2010 4dr Manual S Sedan | $17,605 | 2010 4dr Manual TDI Sedan | $22,830 | $5,225 |
| 2011 4dr Manual Sedan | $15,365 | 2011 4 dr Manual TDI Sedan | $22,995 | $7,630 |
| 2012 4dr Manual Base Sedan | $15,515 | 2013 4dr Manual TDI Sedan | $22,775 | $7,260 |
| 2013 4dr Manual Base Sedan | $15,545 | 2013 4dr Manual TDI Sedan | $22,990 | $7,445 |
| 2014 4dr Manual Sedan | $16,895 | 2014 4dr Manual TDI Sedan | $23,625 | $6,730 |
| 2015 4dr Manual 2.0L S Sedan | $17,325 | 2015 4dr Manual 2.0L TDI Sedan | $21,640 | $4,315 |

## Audi A3: 2009-2015 Model Years

| Standard Model | Standard Model MSRP | TDI Model | TDI Model MSRP | MSRP Premium |
|---|---|---|---|---|
| 2009 4dr HB MT 2.0T FrontTrak | $26,920 | 2009 4dr HB AT S tronic 2.0T FrontTrak | $28,400 | $1,480 |
| 2010 4dr HB S tronic FronTrak 2.0T Premium | $28,750 | 2010 4dr HB S tronic FronTrak 2.0 TDI Premium | $29,950 | $1,200 |
| 2011 4dr HB S tronic FronTrak 2.0T Premium | $28,750 | 2011 4dr HB S tronic FronTrak 2.0 TDI Premium | $30,250 | $1,500 |
| 2012 4dr HB S tronic FronTrak 2.0T Premium | $28,750 | 2012 4dr HB S tronic FronTrak 2.0 TDI Premium | $30,250 | $1,500 |
| 2013 4dr HB S tronic FronTrak 2.0T Premium | $28,750 | 2013 4dr HB S tronic FronTrak 2.0 TDI Premium | $30,250 | $1,500 |
| 2015 FWD 1.8T Premium | $29,900 | 2015 FWD 2.0 TDI Premium | $32,600 | $2,700 |

E.    **Volkswagen's Express Warranties**

60.    In connection with the purchase or lease of each one of its new vehicles, Volkswagen provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturing defect or materials or workmanship."

61.    The CAA requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

62.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emissions systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emissions control unit (ECU), and the onboard emissions diagnostic device or computer.[5]

63.    The EPA requires vehicle manufacturers to issue Defect Warranties with respect to their vehicles' emissions systems.  Thus, Volkswagen also provides an express warranty to its vehicles through a Federal Emissions Control System Defect Warranty.  The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship.  This warranty provides

---

[5] Environmental Protection Agency, *Emissions Warranties for 1995 and Newer Cars and Trucks*, *available at* http://www3.epa.gov/otaq/regs/im/obd/pubs/420f09048 .pdf.

protection for two years or 24,000 miles, whichever comes first, or, for the major emissions control components, for eight years or 80,000 miles, whichever comes first.[6]

64.    As a manufacturer of light-duty vehicles, Volkswagen was required to provide these warranties to purchasers of its CleanDiesel TDI vehicles.

65.    Plaintiffs and the Class members experienced defects within the warranty period.  Despite the existence of warranties, Volkswagen failed to inform Plaintiffs and class members that the Affected Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emissions components free of charge.

**F.    Volkswagen Failed To Meet Applicable Emissions Standards And Employed A "Defeat Device" To Evade The Standards**

66.    Volkswagen knew that its CleanDiesel vehicles could not pass applicable state and federal emissions standards.  To evade this difficulty, Volkswagen intentionally installed a defeat device in the engines of is CleanDiesel class of vehicles. Volkswagen perpetrated this misconduct for years, until experiments conducted by a clean air non-profit group and a university alerted state and federal officials to the nefarious scheme.  In total, Volkswagen's deceitful practice has impacted approximately 500,000 vehicles in the United States, and 11 million vehicles worldwide.

**1.    The International Council For Clean Transportation/West Virginia University Study**

67.    The International Council on Clean Transportation ("ICCT") is an independent nonprofit organization founded to provide first-rate, unbiased research and technical and scientific analysis to environmental regulators.  According to the ICCT's website (www.theicct.org), its mission is "to improve the environmental

---

[6] *Id.*

performance and energy efficiency of road . . . transportation, in order to benefit public health and mitigate climate change."  Peter Mock, the European managing director of the ICCT, and John German, his American counterpart, noted the discrepancies between the performances of Volkswagen CleanDiesel vehicles in Europe compared with the United States.  Mock and German then replicated the tests in the United States, and discovered that Volkswagen CleanDiesel vehicles were, in fact, not clean.

68.    In late 2013, the ITTC enlisted assistance from the West Virginia University ("WVU"), using equipment provided by the school's Center for Alternative Fuels, Engines and Emissions ("CAFEE").  Using a Portable Emissions Measurement System, ("PEMS"), the ICCT and WVU conducted on-road testing of three light-duty diesel vehicles, including a 2012 Volkswagen Jetta and a 2013 Volkswagen Passat, both equipped with a 2.0L TDI CleanDiesel engine.  The PEMS testing measured emissions of NOx, carbon monoxide, THC, and carbon dioxide.

69.    The results of this experiment, which measured tailpipe emissions over a 1,300 mile journey, were "shocking."[7]  According to German, "[w]e were astounded when we saw the numbers."[8]  The study showed that the Volkswagen vehicles exceeded the U.S. NOx emissions standards by up to 35 times.  However, the NOx emissions for these same two vehicles were below the EPA standards when subjected to chassis dynamometer testing performed pursuant state and federal emissions regulations.

70.    The ICCT and WVU brought their concerns and the results of their study to the attention of CARB and the EPA.

---

[7] Jeff Plungis and Dana Hull, *VW's Emissions Cheating Found by Curious Clean-Air Group,* Bloomberg, Sept. 19, 2015, http://www.bloomberg.com/news/articles/2015-09-19/volkswagen-emissions-cheating-found-by-curious-clean-air-group.

[8] *Id.*

### 2. The EPA And CARB Investigations And Volkswagen's Private Admission

71. The CARB and EPA began an investigation into Volkswagen's CleanDiesel vehicles in May 2014. In conjunction with their investigations, both the EPA and CARB engaged in discussions with Volkswagen to determine the reason for the high discrepancy between NOx emissions given off by TDI vehicles in the on-road study performed by ICCT and WVU and the passing levels given off by these same vehicles in federally mandated emissions tests.

72. After CARB began its investigation, Volkswagen initiated testing to replicate the ICCT/WVU testing and attempted to explain away the reasons for the high on-road emissions. In correspondence with the CARB and EPA, Volkswagen maintained that the high on-road emissions were due to a software or technical error, or unexpected in-use conditions.

73. In December 2014, Volkswagen released the results of its own investigation to the EPA and CARB, and proposed a voluntary recall of nearly 500,000 CleanDiesel cars in December 2014, presumably to implement a software patch and recalibration that Volkswagen claimed would solve the problem. The EPA and CARB agreed to this recall, but continued to perform tests to determine whether recall would sufficiently address the problem.

74. Despite Volkswagen's assurances, CARB continued to test Volkswagen cars. CARB tested Volkswagen vehicles in on-road conditions using PEMS and in the laboratory. In so doing, the CARB developed a special dynamometer cycle, which when run, resulted in "uncontrolled NOx emissions." While CARB noted that the on-road testing revealed a slight reduction in emissions following the Volkswagen recall, the NOx emissions were still much higher than expected, and not in compliance with California and EPA standards. Thus, through its testing of Volkswagen CleanDiesel vehicles, CARB determined that NOx emissions were still

in violation of California and U.S. laws.  The CARB then shared its finding with the EPA and with Volkswagen on July 8, 2015.

75.     Finding that "none of the potential technical issues suggested by [Volkswagen] explained" the discrepancies, the EPA and CARB demanded Volkswagen to explain the disparity.  The EPA told Volkswagen that it would withhold certification that Volkswagen's 2016 diesel vehicles complied with U.S. emissions standard, which would make those vehicles unsaleable in the United States.  Discussions between Volkswagen and CARB ensued, spanning several months.

76.     In September 2015, the discussions culminated when Volkswagen admitted to CARB that it had employed a defeat device to circumvent CARB and the EPA emission test procedures since 2008.

77.     During meetings between Volkswagen officials and CARB and EPA employees, Volkswagen *privately admitted*, after months of denials and excuses, that "*these vehicles were designed and manufactured with a defeat device to bypass, defeat, or render inoperative elements of the vehicles' emissions control system*."

### 3.     The EPA And CARB Announce A Notice Of Violation And In-Use Compliance Letter

78.     On September 18, 2015, the EPA issued a NOV against Volkswagen. In it, the EPA revealed that Volkswagen admitted that "*it had designed and installed a defeat device in these vehicles in the form of a sophisticated software algorithm that detected when a vehicle was undergoing emissions testing*."

79.     According to the EPA NOV, software that Volkswagen admitted to installing "*was designed to track the parameters of the federal test procedure and cause emission control systems to underperform when the software determined that the vehicle was not undergoing the federal test procedure*."

80.     Also on September 18, 2015, California issued an In-Use Compliance Letter to Volkswagen.[9]   The EPA and CARB both announced the initiation of investigations based on Volkswagen's alleged actions.  As stated by Cynthia Giles, Assistant Administrator for the Office of Enforcement and Compliance Assurance at the EPA: "Using a defeat device in cars to evade clean air standards is illegal and a threat to public health."[10]   Ms. Giles, expressed the gravity of the situation as follows: "These violations are very serious, not only because illegal defeat devices result in excess emissions many times the allowable standard, but also because VW was concealing the facts from the EPA, the State of California, and consumers."  She summed up the sentiments of many consumers when she said "[w]e expected better from VW."[11]

81.     As detailed in the EPA's NOV, Defendant Volkswagen installed sophisticated software in Volkswagen and Audi diesel vehicles it sells in the United States.  This software, which the EPA officially recognized as a defeat device as defined by the Clean Air Act, is able to detect the conditions when a vehicle is undergoing official emissions testing and engages full emissions controls only while the testing is underway.  By measuring such factors as the position of the steering, the vehicle's speed, and the vehicle's barometric pressure, the software is able to detect the times at which the vehicle is being subjected to emissions tests.  When the vehicle is not undergoing emissions testing, the software does not act to reduce emissions.  In other words, while the car is operating on the open road as part of its normal use, the emissions controls are suppressed.  This results in cars that meet

---

[9] *See* http://arb.ca.gov/newsrel/in_use_compliance_letter.htm.

[10] Press Release, EPA, *California Notify Volkswagen of Clean Air Act Violations* (Sept. 18, 2015).

[11] Ryan Beene, *VW Faced Ultimatum from EPA*, Automotive News, Sept. 20, 2015, http://www.autonews.com/article/20150920/OEM11/309219947/vw-faced-ultimatum-from-epa.

emissions standards in the laboratory or state testing station, but during normal operation emit nitrogen oxides (NOx) at up to 40 times the standard allowed under United States laws and regulations.

82.     According to the EPA NOV, Volkswagen installed its defeat device in the diesel models of at least the following vehicles (the "Affected Vehicles"):

- VW Jetta: 2009-2015 Model Years
- VW Jetta Sportwagen: 2009-2015 Model Years
- VW Beetle: 2009-2015 Model Years
- VW Beetle Convertible: 2012-2015 Model Years
- VW Golf: 2014-2015 Model Years
- VW Passat: 2012-2015 Model Years
- Audi A3: 2009-2015 Model Years

83.     Following the EPA's NOV, it was widely reported in the media, including by The Los Angeles Times, The New York Times, CNN, Bloomberg, and Reuters, that Volkswagen's use of the defeat device impacts approximately 482,000 Volkswagen and Audi diesel vehicles in the United States.[12]   Industry publications also widely covered the revelation, referring to it as a "catastrophe" and stating "[t]here's no other way to describe the allegations from the Environmental Protection Agency that Volkswagen cheated on their emissions tests with nearly a half a million TDI diesel cars."[13]

---

[12] Coral Davenport and Jack Ewing, *VW is Said to Cheat on Diesel Emissions; U.S. to Order Big Recall*, N.Y. Times, Sept. 18, 2015, http://www.nytimes.com/2015/09/19/business/volkswagen-is-ordered-to-recall-nearly-500000-vehicles-over-emissions-software.html?_r=0

[13] Patrick George, *Your Guide to Dieselgate: Volkswagen's Diesel Cheating Catastrophe*, Jalopnik, Sept. 21, 2015, http://jalopnik.com/your-guide-to-dieselgate-volkswagens-diesel-cheating-c-1731857018.

### 4. Volkswagen Admits To Using Defeat Devices To Cheat On Emissions Tests And Announces That It Would Suspend Sales Of CleanDiesel Vehicles

84.     On September 20, 2015, Martin Winterkorn, Volkswagen's Chief Executive Officer, issued a public apology concerning the emissions cheating scandal, acknowledging that the Company had "broken the trust of our customers and the public."[14]  Winkerton added that "Volkswagen has ordered an external investigation of this matter" and claimed that it would "do everything necessary in order to reverse the damage this has caused."

85.     Winterkorn further stated that "[w]e do not and will not tolerate violations of any kind of our internal rules or of the law."  Winterkorn promised that Volkswagen would cooperate fully with the EPA investigation and ordered "an external investigation of this matter."

86.     Also on September 20, 2015, a Volkswagen representative declared, "We have admitted to it to the regulator. It is true. We are actively cooperating with the regulator."[15]

87.     On September 20, 2015, Volkswagen instructed its U.S. dealers to stop selling Affected Vehicles from model years 2015 and 2016.

88.     On September 21, 2015, at the New York unveiling of the new Passat, Michael Horn, the head of Volkswagen's U.S. division, said, "[l]et's be clear about this.  Our company was dishonest.  With the EPA, and the California Air Resources Board, with all of you.  And in my German words, we have totally screwed up."

---

[14] Jack Ewing, *Volkswagen Denied Deception to the E.P.A. for Nearly a Year*, N.Y. Times, Sept. 21, 2015, http://www.houstonchronicle.com/business/article/Volkswagen-denied-deception-to-EPA-for-nearly-a-6520476.php.

[15] Kalyeena Makortoff, *Volkswagen Stock Drops 20% on U.S. Diesel Recall Probe*, CNBC (September 21, 2015), http://www.cnbc.com/2015/09/21/volkswaen-stock-drops-20-on-US-diesel-recall-probe.html.

89.     Also on September 21, 2015, the German government announced its intention to begin an inquiry to ensure that Volkswagen was complying with all laws on auto emissions.[16]

90.     On September 22, 2015, Volkswagen announced that its evasion of emissions standards was not limited to the United States and that as many as eleven million vehicles world-wide could be affected by software allegedly used to cheat emissions tests.

91.     Finally, Volkswagen Chief Executive Officer Winkerton issued a video on September 22, 2015, further apologizing for the Company's misconduct.  In the video message, Winkerton declared that he was "endlessly sorry" that the Company had squandered worldwide trust in the brand.  "Millions of people across the world trust our brands, our cars and our technology . . . I am endlessly sorry that we have disappointed this trust.  I apologize in every way to our customers, our authorities and the whole public for the wrongdoing."  He concluded that "manipulation at Volkswagen must never happen again."

92.     Following Volkswagen's startling admissions and apologies, reports surfaced that the United States Department of Justice launched a criminal investigation into Volkswagen's misconduct.[17]

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

93.     Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein throughout the time period relevant to this action.  Plaintiffs and the other Class members did not

---

[16] Jack Ewing, *Volkswagen Denied Deception to the E.P.A. for Nearly a Year*, N.Y. Times, Sept. 21, 2015, http://www.houstonchronicle.com/business/article/ Volkswagen-denied-deception-to-EPA-for-nearly-a-6520476.php.

[17] Ryan Beene, *VW faces U.S. criminal probe over diesel emissions violations, report says*, Automotive News, Sept. 21, 2015, http://www.autonews.com/article/ 20150921/OEM/150929982/vw-faces-u-s-criminal-probe-over-diesel-emissions-violations-report.

discover, and could not have discovered through the exercise of reasonable diligence, the true, defective nature of the Affected Vehicles until shortly before this litigation commenced, well within the time period of any applicable statutes of limitation. Volkswagen was intent on concealing its illicit behavior and flagrant disregard of state and federal law from regulators and consumers. The truth was not revealed until at least September 18, 2015, when the EPA and the CARB released the results of their investigation into Volkswagen's use of a defeat device in its CleanDiesel vehicles. As the EPA stated in its September 18, 2015 NOV, "only [when confronted by regulators] did Volkswagen admit it had designed and installed a defeat device in these vehicles in the form of a sophisticated software algorithm that detected when a vehicle was undergoing emissions testing." Defendants are further estopped from relying on any statute of limitation because of their concealment of the defective nature of the Affected Vehicles and their engines.

## VI. CLASS ALLEGATIONS

94. Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3) on behalf of themselves and a nationwide Plaintiff class (the "Nationwide Class") consisting of all persons or entities in the United States who purchased, leased or own a Volkswagen or Audi vehicle equipped with a 2.0L TDI CleanDiesel engine.

95. Plaintiffs also bring this action both on behalf of themselves and as a class action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3) on behalf of the following second class (the "California Class") consisting of all persons or entities in the State of California who purchased, leased or own a Volkswagen or Audi vehicle equipped with a 2.0L TDI CleanDiesel engine.[18]

96. Excluded from the Classes are individuals who have personal injury claims resulting from the "defeat device" in an Affected Vehicle. Also excluded

---

[18] The Nationwide Class and the California Class are referred to collectively as "the Classes."

from the Classes are Defendants, their parents, subsidiaries, and affiliates; all officers, directors, employees, and agents of the Defendants; governmental entities; and any agent or employee of any federal or state government acting in their official capacity.   Plaintiffs reserve the right to revise the Class definition based upon subsequently discovered information.

97.   Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants.   Upon information and belief, Plaintiffs believe that there are hundreds of thousands of Class members, geographically dispersed throughout California and the United States, such that joinder of all Class members is impracticable.

98.   There are questions of law and fact common to the Classes that predominate over individual issues, including but not limited to the following:

(a)   Whether Defendants participated in the conduct alleged herein;

(b)   Whether Defendants designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Affected Vehicles into the stream of commerce in the United States;

(c)   Whether Defendants designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Affected Vehicles into the stream of commerce in the United States knowing that the Affected Vehicles did not comply with the applicable state and federal emissions standards;

(d)   Whether the Volkswagen CleanDiesel engine system contains a defeat device;

(e)   Whether Volkswagen knew, or should have known, that the presence of a defeat device in the CleanDiesel vehicles constituted a violation of the CAA and applicable state standards;

(f)   Whether the CleanDiesel engine system contained in the Affected Vehicles can be modified to comply with the EPA

standards; and whether such modification will result in substantial degradation of performance or efficiency of the Affected Vehicles; and/or a diminution of value of the Affected Vehicles;

(g)     Whether Volkswagen was aware that the Affected Vehicles contained a defeat device, and if so, how long Volkswagen was aware;

(h)     Whether Volkswagen's conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

(i)     Whether Plaintiffs and other Class members overpaid for their Affected Vehicles as a result of the defects alleged herein;

(j)     Whether Plaintiffs and other Class members have been harmed by a diminution in value as a result of the defects alleged herein;

(k)     Whether Plaintiffs and other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

(l)     Whether Plaintiffs and other Class members are entitled to damages and other monetary relief, and if so, in what amount.

99.     Plaintiffs' claims are typical of the claims of the Classes.  As alleged herein, Plaintiffs and members of the Classes all sustained damages arising out of the Defendants' same course of unlawful conduct.

100.    Plaintiffs are adequate representatives who have selected competent counsel fully qualified to represent the Classes. Plaintiffs intend to vigorously prosecute this action.

101.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  In contrast, the interest of Class members in individually controlling the prosecution of separate actions is not practical. Further, individual litigation creates a potential for inconsistent or contradictory

judgments, and increases the delay and expense to all parties and the courts. Moreover, even if the individual Class members could afford to conduct individual litigation, the burden on the court system would be too great. The class device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Plaintiffs anticipate no difficulty in the management of this matter as a class action.

102. Certification is also warranted under Fed. R. Civ. P. 23(b)(2) because Volkswagen has acted or refused to act on grounds generally applicable to the Classes, thereby making final injunctive relief and declaratory relief appropriate with respect to the Classes as a whole.

## VII.  CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT,
**15 U.S.C. § 2301,** *et seq.*
**(On Behalf Of The Nationwide Class)**

103. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

104. This claim is brought by all Plaintiffs on behalf of the Nationwide Class.

105. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

106. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

107. Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

108. The Affected Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

109.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

110.   Volkswagen's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Affected Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

111.   Volkswagen breached these warranties as described in more detail above.  Without limitation, the Affected Vehicles share a common design defect in that they are equipped with a defeat device intended to circumvent applicable state and federal emissions standards and U.S. pollution laws.  As a result, the Affected Vehicles emit unsafe levels of dangerous NOx.  Volkswagen has admitted that the Affected Vehicles are defective in admissions to the EPA and CARB that Volkswagen deliberately installed a defeat device in order to cheat emissions certification tests.

112.   Plaintiffs and each of the other members of the Nationwide Class have had sufficient direct dealings with either Volkswagen or its agents (dealerships) to establish privity of contract between Volkswagen, on the one hand, and Plaintiffs and each of the other Nationwide Class members, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Volkswagen and its dealers, and specifically, of Volkswagen's implied warranties. In such a case as this, the dealers were not intended to be the ultimate consumers of the Affected Vehicles; instead, the warranty agreements were designed for and intended to benefit the consumers only.  Thus, the dealers have no rights under the warranty agreements provided with the Affected Vehicles.  Finally, privity is also not required because the Affected Vehicles are dangerous instrumentalities due to the defects and nonconformities described above.

113.   Affording Volkswagen the opportunity to cure its breach of written warranties would be unnecessary and futile in this case.  At the time of sale or lease of each Affected Vehicle, Volkswagen knew, should have known, or was reckless in not knowing, of its misrepresentations concerning the Affected Vehicles' inability to perform as warranted.  Despite this, Volkswagen nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Volkswagen a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

114.   Plaintiffs and the other members of the Nationwide Class would suffer economic hardship if they returned their Affected Vehicles but did not receive the return of all payments made by them.

115.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Nationwide Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## COUNT II

### BREACH OF CONTRACT
**(On Behalf Of The Nationwide Class)**

116.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

117.   This claim for common law breach of contract is brought by all Plaintiffs on behalf of the Nationwide Class.

118.   Volkswagen breached contractual obligations by tendering to Plaintiffs and the Nationwide Class vehicles equipped with a "defeat device" designed to

reduce the effectiveness of the vehicle's emission control system, causing the Affected Vehicles to emit pollutants at up to 40 times the EPA emission standards.

119.  The "defeat device" present in the Affected Vehicles did not constitute a minor breach, as the existence of the "defeat devices" caused the Affected Vehicles to emit pollutants at a substantially higher rate than Volkswagen warranted and in violation of federal and state emission standards.  As such, Plaintiffs and the Nationwide Class would not have purchased or leased the Affected Vehicles at the price they paid, or at all, had they known of the presence of the "defeat device."

120.  As a direct and proximate result of Defendants' breach of contract or warranty, Plaintiffs and the Nationwide Class have suffered damages.

## COUNT III

### FRAUDULENT CONCEALMENT
### AND FRAUDULENT MISREPRESENTATION
### (On Behalf Of The Nationwide Class)

121.  Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

122.  This claim is brought by all Plaintiffs on behalf of the Nationwide Class.

123.  As detailed above, Volkswagen made material omissions and affirmative misrepresentations regarding the Affected Vehicles.

124.  Volkswagen knew these representations were false when made.

125.  The vehicles Plaintiffs and the Nationwide Class purchased or leased were defective because the vehicles were subject to a "defeat device" that would reduce the effectiveness of the Affected Vehicles' emission control system as well as their road performance.

126.  Volkswagen had a duty to disclose that these vehicles were defective in that the vehicles were subject to a "defeat device" that would reduce the effectiveness of the vehicles' emission control system.

127.   Defendants' concealment was material because if it had been disclosed Plaintiffs and the Nationwide Class would not have purchased or leased the vehicles at the price they paid, or would not have purchased or leased the vehicles at all.

128.   Similarly, Defendants' representations were material because they were facts that would typically be relied upon by an individual purchasing or leasing an automobile, and in particular, vehicles sold under a Clean Diesel marketing campaign.  Volkswagen knew or recklessly disregarded that its representations as to the Affected Vehicles were false and or omitted material information. Volkswagen intentionally made the false statements in order to induce Plaintiffs and the Nationwide Class to purchase or lease the Affected Vehicles.

129.   Plaintiffs and Nationwide Class members relied upon Defendants' representations and omissions in purchasing or leasing the Affected Vehicles.

130.   As a result of their reliance, Plaintiffs and other members of the Nationwide Class have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

131.   Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Nationwide Class members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

### UNJUST ENRICHMENT
### (On Behalf Of The Nationwide Class)

132.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

133.   This claim is brought by all Plaintiffs on behalf of the Nationwide Class.

134.   Plaintiffs and the Nationwide Class paid the value of vehicles that have fully operational emission control systems that comply with federal and state emission standards, would not be compromised by the need for repairs, and could be legally operated, but were provided with vehicles that are defective, needed repairs, and could not be legally operated.

135.   As such, Plaintiffs and other members of the Nationwide Class conferred a windfall upon Volkswagen, which knew of the windfall and has unjustly retained such benefits.

136.   As a direct and proximate result of Volkswagen's unjust enrichment, Plaintiffs and the Nationwide Class have suffered and continue to suffer various damages, including, but not limited to, restitution of all amounts by which Defendants were enriched through its misconduct.

## COUNT V

### VIOLATIONS OF STATE CONSUMER PROTECTION AND UNFAIR COMPETITION STATUTES
### (On Behalf Of The Nationwide Class)

137.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

138.   This claim is brought by all Plaintiffs on behalf of the Nationwide Class.

139.   Volkswagen engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices with respect to the sale of the Affected Vehicles in violation of consumer protection and unfair competition statutes in every (or nearly every) state, including: Alaska Stat. § 45-50-471, *et seq.*; Ariz. Rev. Stat. § 44-1521, *et seq.*; Arkansas Code § 4-88-101, *et seq.*; Cal. Civ. Code § 1770, *et seq.*, Cal. Bus. & Prof. Code § 17200, *et seq.*, and Cal. Bus. & Prof. Code § 17070; Colo. Rev. Stat. § 6-1-101, *et seq.*; Conn. Gen. Stat. § 42-110A, *et seq.*; 6 Del. Code §

2513, *et seq.* and 6 Del. Code § 2532, *et seq.*; D.C. Code Ann. § 28-3901, *et seq.*, Florida Stat. § 501.201, *et seq.*; Ga. Code Ann. § 10-1-370, *et seq.*; Haw. Rev. Stat. Ann. § 481A-3; Idaho Code § 48-601, *et seq.*; 815 Ill. Comp. Stat. 505/1, *et seq.* and 815 Ill. Comp. Stat. 510/1, *et seq.*; Ind. Code § 24-5-0.5-3; Iowa Code § 714H.1, *et seq.*; Kan. Stat. Ann. § 50-623, *et seq.*; Ky. Rev. Stat. § 367.110, *et seq.*; Me. Rev. Stat. Ann. Tit. 5 § 205-A, *et seq.*; Md. Code Com. Law § 13-101, *et seq.*; Mass. Gen. Laws chapter 93A § 1, *et seq.*; Mich. Comp. Laws § 445.901; Minn. Stat. § 325F.69, *et seq.* and Minn. Stat. § 325D.43, *et seq.*; Mo. Ann. Stat. 407.020; Neb. Rev. Stat. § 87-302 and Neb. Rev. Stat. § 59-1601, *et seq.*; Nev. Rev. Stat. § 598.0903, *et seq.*; New Hampshire Rev. Stat. § 358-A:1, *et seq.*; N.J. Stat. Ann. § 56:8-1, *et seq.*; New Mexico Stat. Ann. § 57-12-1, *et seq.*; N.Y. Gen. Bus. Law § 349, *et seq.*; North Carolina Gen. Stat. § 75-1.1, *et seq.*; N.D. Cent. Code § 51-15-02; Ohio Rev. Code Ann. § 1345.01, *et seq.* and Ohio Rev. Code Ann. § 4165.01, *et seq.*; Okla. Stat. Tit. 15 § 751, *et seq.* and 78 Okla. Stat. Ann. § 51, *et seq.*; Or. Rev. Stat. § 646.605, *et seq.*; 73 Pa. Stat. § 201-1, *et seq.*; Rhode Island Gen. Laws § 6-13.1-1, *et seq.*; S.D. Codified Laws § 37-24-6, *et seq.*; Tex. Bus. & Com. Code § 17.41, *et seq.*; Utah Code Ann. § 13-11-1, *et seq.*; Vt. Stat. Ann. Tit. 9, § 2451, *et seq.*; Va. Code Ann. 59.1-200, *et seq.*; Rev. Code Wash. Ann. § 19.86.010, *et seq.*; W. Va. Code § 46A-1-101, *et seq.*; Wisc. Stat. § 100.18, *et seq.*; and Wyo. Stat. § 45-12-105, *et seq.*

140.  Volkswagen's misrepresentations and omissions regarding the emission compliance of its vehicles as detailed above were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

141.  Volkswagen's intentional and purposeful acts, described above, were intended to and did cause Plaintiffs and the Class to pay artificially inflated prices for Affected Vehicles purchased or leased in the states (and the District of Columbia) listed above.

142.  As a direct and proximate result of Volkswagen's unlawful conduct, Plaintiffs and Nationwide Class members have been injured in their business and

property in that they paid more for the Affected Vehicles than they otherwise would have paid in the absence of Volkswagen's unlawful conduct.

143.   All of the wrongful conduct alleged herein occurred in the conduct of Volkswagen's business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that was perpetrated nationwide.

144.   Plaintiffs and other members of the Nationwide Class members are therefore entitled to all appropriate relief as provided for by the laws of the states listed above, including but not limited to, actual damages, injunctive relief, attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of their unlawful conduct.

**COUNT VI**

**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT, CAL. CIV. CODE §§ 1791.1 & 1792**
**(On Behalf Of The California Class)**

145.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

146.   This claim is brought by Plaintiffs Sticklin, Gottlieb, and Rakhmet-Zade (the "California Plaintiffs") on behalf of the California Class.

147. California Plaintiffs and other California Class members who purchased or leased the Affected Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

148.   The Affected Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

149.   Volkswagen is a "manufacturer" of the Affected Vehicles within the meaning of Cal. Civ. Code § 1791(j).

150.   Volkswagen impliedly warranted to California Plaintiffs and the other California Class members that its Affected Vehicles were "merchantable" within the

meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Affected Vehicles do not have the quality that a buyer would reasonably expect.

151.   Cal. Civ. Code § 1791.1(a) states:

(a)   "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

- Pass without objection in the trade under the contract description.

- Are fit for the ordinary purposes for which such goods are used.

- Are adequately contained, packaged, and labeled.

- Conform to the promises or affirmations of fact made on the container or label.

152.   The Affected Vehicles would not pass without objection in the automotive trade because they do not pass EPA and state law emissions regulations.

153.   Because the "defeat device" falsely causes Affected Vehicles to obtain EPA certification and pass emissions tests when in fact they omit 40 times the permitted level of NOx, they are not safe to drive and thus not fit for ordinary purposes.

154.   The Affected Vehicles are not adequately labeled because the labeling fails to disclose the "defeat device" that causes emissions systems of the Affected Vehicles to become inoperative during normal use.

155.   Volkswagen breached the implied warranty of merchantability by manufacturing and selling Affected Vehicles containing the "defeat device." Furthermore, Volkswagen's fraudulent use of the "defeat device" has caused California Plaintiffs and the other California Class members to not receive the benefit of their bargain and have caused Affected Vehicles to depreciate in value.

156.   As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, California Plaintiffs and the other California Class members received goods whose dysfunctional condition substantially impairs their

value to California Plaintiffs and the other California Class members. California Plaintiffs and the other Class members have been damaged as a result of the diminished value of Volkswagen's products, the products' malfunctioning, and the nonuse of their Affected Vehicles.

157.   Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, California Plaintiffs and the other California Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Affected Vehicles, or the overpayment or diminution in value of their Affected Vehicles.

158.   Pursuant to Cal. Civ. Code § 1794, California Plaintiffs and the other California Class members are entitled to costs and attorneys' fees.

## COUNT VII

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, CAL. COM. CODE § 2314**
**(On Behalf Of The California Class)**

159.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

160.   This claim is brought by the California Plaintiffs on behalf of the California Class.

161.   Volkswagen is and was at all relevant times a merchant with respect to motor vehicles under Cal. Com. Code § 2104.

162.   A warranty that the Affected Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to Cal. Com. Code § 2314.

163.   These Affected Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Affected Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain safety and emissions functions inoperative; and the CleanDiesel engine system was not adequately designed, manufactured, and tested.

164.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators.

165.   California Plaintiffs and each California Class member has had sufficient direct dealings with either Volkswagen or its agents (dealerships) to establish privity of contract between Volkswagen, on the one hand, and California Plaintiffs and each of the other California Class members, on the other hand. Nonetheless, privity is not required here because California Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Volkswagen and its dealers, and specifically, of Volkswagen's implied warranties. In such a case as this, the dealers were not intended to be the ultimate consumers of the Affected Vehicles; instead, the warranty agreements were designed for and intended to benefit the consumers only.  Thus, the dealers have no rights under the warranty agreements provided with the Affected Vehicles.

166.   As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, California Plaintiffs and the other California Class members have been damaged in an amount to be proven at trial.

## COUNT VIII

### BREACH OF CONTRACT
**(On Behalf Of The California Class)**

167.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

168.   California Plaintiffs plead this count pursuant to the laws of California on behalf of all members of the California Class.

169.   Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the "defeat device" and/or defective design as alleged herein, caused California Plaintiffs and the other California Class members to make their purchases or leases of their Affected Vehicles. Absent those misrepresentations and omissions, California Plaintiffs and

the other California Class members would not have purchased or leased these Affected Vehicles, would not have purchased or leased these Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and the "defeat device." Accordingly, California Plaintiffs and the other California Class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain.

170.   Each and every sale or lease of an Affected Vehicle constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing California Plaintiffs and the other California Class members' defective Affected Vehicles and by misrepresenting or failing to disclose the existence of the "defeat device" and/or defective design, including information known to Volkswagen rendering each Affected Vehicle less safe and emissions compliant, and thus less valuable, than vehicles not equipped with CleanDiesel engine systems and "defeat devices."

171.   As a direct and proximate result of Volkswagen's breach of contract, California Plaintiffs and the California Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT IX

**VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, *et seq*.**
**(On Behalf Of The California Class)**

172.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

173.   This claim is brought by the California Plaintiffs on behalf of the California Class.

174.   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*, proscribes acts of unfair competition, including "any unlawful,

unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

175.   Volkswagen's conduct, as described herein, was and is in violation of the UCL. Volkswagen's conduct violates the UCL in at least the following ways:

(a)   By knowingly and intentionally concealing from Plaintiffs and the other California Class members that the Affected Vehicles suffer from a design defect while obtaining money from Plaintiffs and the Class;

(b)   By marketing Affected Vehicles as possessing functional and defect-free, EPA compliant CleanDiesel engine systems;

(c)   By purposefully installing an illegal "defeat device" in the Affected Vehicles to fraudulently obtain EPA certification and cause Affected Vehicles to pass emissions tests when in truth and fact they did not pass such tests;

(d)   By violating federal laws, including the CAA; and

(e)   By violating other California laws, including California laws governing vehicle emissions and emission testing requirements.

176.   Volkswagen's misrepresentations and omissions alleged herein caused the California Plaintiffs and other members of the California Class members to purchase or lease their Affected Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other California Class members would not have purchased or leased these vehicles, would not have purchased or leased these Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain CleanDiesel engine systems that failed to comply with EPA and California emissions standards.

## COUNT X

### VIOLATIONS OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE § 1750, *et seq*.
#### (On Behalf Of The California Class)

177. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

178. This claim is brought by the California Plaintiffs on behalf of the California Class.

179. California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

180. The Affected Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

181. Plaintiffs and the other California Class members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs, the other California Class members, and Volkswagen are "persons" as defined in Cal. Civ. Code § 1761(c).

182. As alleged above, Volkswagen made numerous representations concerning the benefits, efficiency, performance and safety features of CleanDiesel engine systems that were misleading.

183. In purchasing or leasing the Affected Vehicles, Plaintiffs and the other California Class members were deceived by Volkswagen's failure to disclose that the Affected Vehicles were equipped with defective CleanDiesel engine systems that failed EPA and California emissions standards.

184. Volkswagen's conduct, as described hereinabove, was and is in violation of the CLRA. Volkswagen's conduct violates at least the following enumerated CLRA provisions:

    (a) Cal. Civ. Code § 1770(a)(5): Representing that goods have characteristics, uses, and benefits which they do not have;

(b)     Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

(c)     Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

(d)     Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

185.   The California Plaintiffs and the other California Class members have suffered injury in fact and actual damages resulting from Volkswagen's material omissions and misrepresentations because they paid an inflated purchase or lease price for the Affected Vehicles.  Their vehicles will be subject to a diminution in value, and the owners and lessors will be required to pay additional fuel costs if and when their Affected Vehicles are made to comply with emissions standards.

186.   Volkswagen knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the CleanDiesel engine systems, and that the Affected Vehicles were not suitable for their intended use.

187.   The facts concealed and omitted by Volkswagen to California Plaintiffs and the other California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Affected Vehicles or pay a lower price. Had California Plaintiffs and other California Class members known about the defective nature of the Affected Vehicles, they would not have purchased or leased the Affected Vehicles or would not have paid the prices they paid.

188.   Volkswagen has been provided with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a).

189.   California Plaintiffs' and the other California Class members' injuries were proximately caused by Volkswagen's fraudulent and deceptive business practices.

190. Therefore, Plaintiffs and the other California Class members are entitled to equitable and monetary relief under the CLRA.

## COUNT XI

**VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW,
CAL. BUS. & PROF. CODE § 17500, *et seq.***
**(On Behalf Of The California Class)**

191. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

192. This claim is brought by the California Plaintiffs on behalf of the California Class.

193. Cal. Bus. & Prof. Code § 17500 states:

"It is unlawful for any ... corporation ... with intent directly or indirectly to dispose of real or personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device … or in any other manner or means whatever, including over the Internet, any statement ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

194. Volkswagen caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Volkswagen, to be untrue and misleading to consumers, including the California Plaintiffs and the other California Class members.

195. Volkswagen has violated Cal. Bus. & Prof. Code § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality

of Affected Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

196. California Plaintiffs and the other California Class members have suffered an injury in fact, including the loss of money or property, as a result of Volkswagen's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Affected Vehicles, California Plaintiffs and the other California Class members relied on the misrepresentations and/or omissions of Volkswagen with respect to the safety, performance and reliability of the Affected Vehicles. Volkswagen's representations turned out not to be true because the Affected Vehicles are distributed with faulty and defective CleanDiesel engine systems, rendering certain safety and emissions functions inoperative. Had California Plaintiffs and the other California Class members known this, they would not have purchased or leased their Affected Vehicles and/or paid as much for them. Accordingly, California Plaintiffs and the other California Class members overpaid for their Affected Vehicles and did not receive the benefit of their bargain.

197. All of the wrongful conduct alleged herein occurred in the conduct of Volkswagen's business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that was perpetrated in California.

198. California Plaintiffs, individually and on behalf of the other California Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Volkswagen from continuing their unfair, unlawful, and/or deceptive practices and to restore to California Plaintiffs and the other California Class members any money Volkswagen acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT XII

### FRAUDULENT CONCEALMENT
### (On Behalf Of The California Class)

199. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

200. California Plaintiffs plead this count pursuant to the laws of California on behalf of all members of the California Class.

201. Volkswagen intentionally concealed and suppressed material facts concerning the quality of the Affected Vehicles. As alleged in this Complaint, Volkswagen enacted a surreptitious plan to install a software program in its CleanDiesel vehicles, the sole purpose of which was to hide the fact that the vehicles emitted high levels of NOx. The use of this "defeat device" allowed Volkswagen Affected Vehicles to circumvent federal and state vehicle emissions standards. Specifically, the "defeat device" was designed to recognize the conditions present during emissions certification testing, and activate under those conditions such that the vehicles would appear to give off low levels of emissions. However, when the vehicles were not in emissions certification testing, but were actually operating on the road, the vehicles in fact gave off emissions over 40 times greater than the applicable standards. Through this deliberate plan on the part of Volkswagen, Affected Vehicles were able to pass emissions certifications by way of deliberately induced false readings.

202. California Plaintiffs and the California Class members reasonably relied on Volkswagen's false representations. They were unaware of, and had no ability to discover, Volkswagen's extremely sophisticated plan to evade state and federal emissions standards through the use of a "defeat device."

203. Volkswagen concealed and suppressed material facts about its utter disregard for compliance with federal and state clean air law, and emissions

regulations that are meant to protect the public and consumers.  In flagrant fashion, Volkswagen instead chose to emphasize profits and sales over these principles.

204.   Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its scheme to regulators or consumers, including California Plaintiffs and California Class members. Volkswagen did so in order to boost the reputations of its vehicles and to falsely assure purchasers and leasors of its vehicles, including certified previously owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and state clean air law and emissions regulations, and that its vehicles likewise comply with applicable law and regulations.  Volkswagen's false representations were material to consumers, both because they concerned the quality of the affected vehicles, including their compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles.   As Volkswagen well knew, its customers, including California Plaintiffs and California Class members, highly valued that the vehicles they were purchasing or leasing were clean diesel cars, and they paid accordingly.

205.   Volkswagen had a duty to disclose the emissions scheme it engaged in with respect to the vehicles at issue because knowledge of the scheme and its details were known and/or accessible only to Volkswagen. Volkswagen had exclusive knowledge regarding the installation of the defeat device in the Affected Vehicles. In addition, Volkswagen had a duty to disclose because it knew the facts were not known to or reasonably discoverable by Plaintiffs or California Class members.

206.   Volkswagen also had a duty to disclose the deficiencies of the Affected Vehicles' safety, quality, functionality, and reliability because it consistently made affirmative representations about the qualities of its vehicles with respect to emissions standards and fuel efficiency.  Volkswagen repeatedly referred to these Affected Vehicles as clean diesel cars, or cars with clean diesel engines.  These

statements and representations were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the use of a defeat device and the actual emissions of the Affected Vehicles.

207.   Once Volkswagen made representations to the public about the quality, reliability, and emissions of its Affected Vehicles, Volkswagen had the duty to disclose the entire truth and not omit crucial facts. These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by California Plaintiffs and California Class members. Whether a manufacturer's products comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer.

208.   Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to increase its profits and to induce California Plaintiffs and the other California Class members to purchase the Affected Vehicles at a higher price than warranted by the Affected Vehicles' true value.

209.   Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to maintain its reputation in the marketplace as a maker of vehicles complying with federal and state laws governing clean air and emissions.

210.   On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiffs and California Class members by concealing material information regarding the emissions qualities of Affected Vehicles and the use of a defeat device.

211.   California Plaintiffs and California Class members were unaware of the omitted material facts referenced herein.  If California Plaintiffs and the California Class members had been made aware of the concealed and/or omitted facts, they would not have acted as they did.  California Plaintiffs' and California Class members' actions were justified. Volkswagen was in exclusive control of the material

facts, and such facts were not known to the public, California Plaintiffs, or California Class members.

212.   As a result of Volkswagen's actions, California Plaintiffs and California Class members have sustained damage.  The value of vehicles owned by California Plaintiffs and the California Class members has been diminished due to Volkswagen's concealment of the true quality and quantity of those vehicles' emissions.  Volkswagen's failure to disclose the use of a defeat device to circumvent state and federal emissions standards has damaged the brand reputation of Volkswagen and Audi, causing California Plaintiffs' and the California Class members' vehicles to decrease in value.  If California Plaintiffs and the California Class members had been aware of Volkswagen's emissions scheme and the Company's deliberate disregard for applicable state and federal emissions laws, they would have either paid less for their vehicles, or chosen not to purchase or lease the Affected Vehicles.

213. Accordingly, Volkswagen is liable to California Plaintiffs and California Class members for damages in an amount to be proven at trial.

214.   Volkswagen's acts were done wantonly, maliciously, oppressively, and deliberately, with intent to defraud, and in reckless disregard of California Plaintiffs' and California Class members' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## VIII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and California Class, respectfully request that the Court enter judgment in their favor and against Volkswagen, as follows:

A.     Certification of the proposed Nationwide Class and California Class, including appointment of Plaintiffs' counsel as Class Counsel;

1       B.     An order temporarily and permanently enjoining Volkswagen from

2   continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged

3   in this Complaint;

4       C.     Costs, restitution, damages, including punitive damages, and

5   disgorgement in an amount to be determined at trial;

6       D.     An order requiring Volkswagen to pay both pre- and post-judgment

7   interest on any amounts awarded;

8       E.     An award of costs and attorneys' fees; and

9       F.     Such other or further relief as may be appropriate.

## IX.    <u>JURY TRIAL DEMAND</u>

Plaintiffs hereby demand a jury trial for all claims so triable.


Dated: September 22, 2015                  Respectfully submitted,

                                           BERNSTEIN LITOWITZ BERGER
                                               & GROSSMANN LLP


                                           _/s/ Blair A. Nicholas_____
                                             BLAIR A. NICHOLAS

                                           BLAIR A. NICHOLAS
                                           BENJAMIN GALDSTON
                                           DAVID R. KAPLAN
                                           LUCAS E. GILMORE
                                           RACHEL FELONG
                                           12481 High Bluff Drive, Suite 300
                                           San Diego, CA 92130
                                           Tel:   (858) 793-0070
                                           Fax:   (858) 793-0323